UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON LETOURNEAU,

Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

Case No. 20-cv-13139
Honorable Denise Page Hood
Magistrate Judge Elizabeth A. Stafford

---

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT (ECF NOS. 14, 17)**

---

I.     **Introduction**

Plaintiff Shannon Letourneau, successor to decedent Barbara A.

Karnafel, appeals a final decision of defendant Commissioner of Social

Security (Commissioner) denying Karnafel's application for disability

insurance benefits (DIB) under the Social Security Act.[1]  Both parties have

filed summary judgment motions, referred to this Court for a report and

---

[1] Karnafel originally sought DIB and supplemental security income (SSI).
ECF No. 14, PageID.527.  But since Letourneau acknowledges that next of
kin are not entitled to collect a decedent's SSI, ECF No. 19, PageID.595-
596, the case is now limited to her claim for DIB.

recommendation under 28 U.S.C. § 636(b)(1)(B).  After review of the record, the Court **RECOMMENDS** that:

- Letourneau's motion (ECF No. 14) be **DENIED**;

- the Commissioner's motion (ECF No. 17) be **GRANTED**; and

- the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

## II.    Background

### A.  Karnafel's Background and Disability Application

Born in June 1966, Karnafel was 50 years old at the time of her alleged onset date.  ECF No. 12, PageID.73.  Karnafel had past relevant work as a packager and machine feeder.  *Id.*  She claimed to be disabled from coronary artery disease (CAD), diabetes, neuropathy, and chronic obstructive pulmonary disease (COPD).  ECF No. 12, PageID.156.

After the Commissioner denied her disability application initially, Karnafel requested a hearing, which took place in August 2019.  ECF No. 12, PageID.62.  Karnafel and a vocational expert (VE) testified at the hearing.  *Id.*  In the decision that followed, the ALJ found Karnafel not disabled.  *Id.* at PageID.74.  The Appeals Council denied review, and the

ALJ's decision became the final decision of the Commissioner.  *Id.* at

PageID.48.  Karnafel timely filed for judicial review.  ECF No. 1.

### B. The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A).

The Commissioner determines whether an applicant is disabled by

analyzing five sequential steps.  First, if the applicant is "doing substantial

gainful activity," he or she will be found not disabled.  20 C.F.R.

§ 404.1520(a)(4).  Second, if the claimant has not had a severe impairment

or a combination of such impairments for a continuous period of at least 12

months, no disability will be found.  *Id.*  Third, if the claimant's severe

impairments meet or equal the criteria of an impairment set forth in the

Commissioner's Listing of Impairments, the claimant will be found disabled.

*Id.*  If the fourth step is reached, the Commissioner considers its

assessment of the claimant's residual functional capacity (RFC), and will

find the claimant not disabled if he or she can still do past relevant work.

*Id.*  At the final step, the Commissioner reviews the claimant's RFC, age,

3

education, and work experiences, and determines whether the claimant could adjust to other work.  *Id.*  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Karnafel was not disabled.  At the first step, she found that Karnafel had not engaged in substantial gainful activity since the alleged onset date.  ECF No. 12, PageID.65.  At the second step, the ALJ found that Karnafel had the severe impairments of ischemic heart disease status post triple coronary artery bypass surgery, obesity, COPD, diabetes mellitus, degenerative disc disease (DDD) of the cervical spine status post fusion surgery, lymphedema, gastro esophageal reflux disease, hypertension, hyperlipidemia, and obstructive sleep apnea.  *Id.*  Next, the ALJ concluded that none of her impairments, either alone or in combination, met or medically equaled the severity of a listed impairment.  *Id.* at PageID.66.

Between the third and fourth steps, the ALJ found that Karnafel had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently.  She can stand and/or walk for 4 hours and sit for 6 hours in an 8-hour workday with normal

breaks.  She can never climb ladders, ropes or scaffolds and only occasionally climb ramps and stairs.  She can only occasionally balance on narrow, slippery, or erratically moving surfaces.  She can occasionally stoop and kneel, but never crouch or crawl.  There can be occasional exposure to extreme heat, extreme cold and vibration.  There can be occasional exposure to dust, fumes, odors, gases and poor ventilation, but there should be no work at unprotected heights or in the vicinity of uncovered, unguarded moving machinery.

*Id.* at PageID.68.  At step four, the ALJ found that Karnafel could not perform her past relevant work as a packager or machine feeder.  *Id.* at PageID.73.  At the final step, after considering Karnafel's age, education, work experience, RFC, and the testimony of the VE, the ALJ also concluded that she could perform jobs that existed in significant numbers in the national economy, including assembler and inspector.  *Id.* at PageID.73-74.  The ALJ thus concluded Karnafel was not disabled.  *Id.* at PageID.74.

## III.   Analysis

### A.

Under § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted).

Letourneau argues that the ALJ failed to properly weigh the medical opinion evidence, consider Karnafel's subjective complaints, and consider Karnafel's strong work history in evaluating whether the alleged limiting effects of her conditions align with the medical record.  The Court disagrees and recommends that the ALJ's decision be affirmed.

**B.**

Letourneau first argues that in determining the RFC, the ALJ failed to properly weigh the medical opinions of Karnafel's cardiologist, Linda Gossett, M.D.; her primary care physician Michael R. McNamara, D.O., and treating source Ronald F. Applebey, P.A.; and state agency reviewing physician Ashok Sachdev, M.D.  Letourneau claims that these opinions reflect the record evidence and would support a more restrictive RFC rendering Karnafel disabled.

6

ALJs must assess the persuasiveness of all opinions from both treating and non-treating sources by considering several factors, the most important being the opinion's supportability and consistency with the record evidence. 20 C.F.R. § 404.1520c(b)(2).[2] Under the supportability factor, the more relevant "objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion," the more persuasive the medical opinion will be. § 404.1520c(c)(1). An opinion that is more consistent with the evidence from other medical sources and nonmedical sources is also more persuasive. § 404.1520c(c)(2).

In addressing Letourneau's arguments, the Court is mindful that it lacks the authority to independently weigh the evidence. *Hatmaker v. Comm'r of Soc. Sec.*, 965 F. Supp. 2d 917, 930 (E.D. Tenn. 2013) ("The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion."); *see also Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("If the Secretary's

---

[2] The treating physician rule, which required ALJs to give controlling weight to well-supported opinions of treating sources, does not apply here because Karnafel applied for disability after March 27, 2017. *See Wolfe v. Comm'r of Soc. Sec.*, 16-13620, 2017 WL 6627044, at *7 n.4 (E.D. Mich. Nov. 26, 2017), *adopted*, 2017 WL 6621538 (E.D. Mich. Dec. 28, 2017).

decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion."). Letourneau's arguments about how the ALJ weighed the evidence conflict with this Court's limited role.  None of her arguments suggest that the ALJ abused her wide discretion.

### 1.

In February 2018, Dr. Gossett completed a form stating that Karnafel's functional capacity was limited to "Class III," meaning,

> Patients with cardiac disease resulting in marked limitations of physical activity.  They are comfortable at rest.  Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain.  Walking more than one level block, climbing one flight of stairs or the usual activities of daily living do produce symptoms.

ECF No. 12, PageID.343.  Letourneau notes that the VE testified that someone who could stand or walk only two hours in an eight-hour day would be precluded from performing light work.  *See* ECF No. 12, PageID.109-110.  Thus, if Karnafel were restricted to sedentary work consistent with Dr. Gossett's evaluation, she would be disabled under the Medical-Vocational Guidelines ("the grids").  *See* 20 C.F.R. § 404, Subpt. P, App. 2, Rule 201.09 (an individual limited to sedentary work and closely

approaching advanced age with a limited education and unskilled previous work experience is disabled).

The ALJ found Dr. Gossett's opinion unpersuasive, reasoning that "she merely checked a box on the form and there is a lack of reference to supportive diagnostic testing," and that "the opinion is not set forth in clear, vocationally relevant terms."  ECF No. 12, PageID.72.  The ALJ also observed that the record showed Karnafel's "condition is stable, that medications are useful and without side effects."  *Id.*

As to Karnafel's ischemic heart disease, the ALJ observed that a coronary angiography showed mild to moderate disease while other testing was normal.  *Id.* at PageID.69.  During the relevant period,[3] Karnafel's heart condition was stable and conservatively managed with medications—Karnafel was not hospitalized and her physical examinations were normal.  *Id.*  As for her COPD, the ALJ noted that this condition was managed with medication, as respiratory and cardiovascular examinations were generally

---

[3] The relevant period for Karnafel's claim runs from her alleged onset date of April 6, 2017 to her date last insured of December 31, 2018.  *See Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 421 (6th Cir. 2013).  And since Karnafel filed a prior application that was denied by another ALJ on April 5, 2017 and affirmed by the Appeals Council, ECF No. 12, PageID.62, she may not be found disabled before April 6, 2017.  *See* 20 C.F.R. § 404.955; *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232 (6th Cir. 1993).

9

normal.  *Id.* at PageID.69-70.  While Karnafel had two exacerbations, those were treated by Karnafel's primary care physician.  *Id.*  The ALJ found that Karnafel's obstructive sleep apnea was treated conservatively with a CPAP device.  *Id.* at PageID.69.  Although Karnafel complained of daytime sleepiness and that the CPAP mask often fell off at night, the ALJ observed the lack of evidence that she returned to the sleep clinic for adjustments.  *Id.* at PageID.70.

The Court finds the ALJ's conclusions are supported by substantial evidence.  Karnafel has a history of CAD with stent placement and bypass surgery.  *Id.* at PageID.335.  A January 2016 coronary angiography showed moderate pulmonary hypertension with reduced resting cardiac output, as well as stable CAD with no high-grade stenoses.  *Id.* at PageID.335-337.  A myocardial perfusion performed at that time showed an abnormal perfusion defect "with a large-sized, moderately severe, reversible inferior [and] inferoseptal perfusion abnormality," with an ejection fraction of 74%.[4]  *Id.* at PageID.320.  And an echocardiogram showed low normal left ventricular function with an ejection fraction of 50% to 55%.  *Id.*

---

[4] A normal ejection fraction is 50% to 75%, according to the American Heart Association.  *See* Mayo Clinic, Ejection fraction: What does it measure? (Feb. 26, 2021), *available at* https://perma.cc/RGC6-X7TS (last visited May 10, 2022).

Despite the perfusion defect, there is no indication in the record that it causes significant limitations; Karnafel's healthcare providers did not specifically address the perfusion defect but instead referred generally to CAD in their treatment notes.

In December 2016, Karnafel reported to Dr. Gossett that she felt well with only minor complaints, including fatigue and dyspnea.  *Id.* at PageID.327.  She had not been hospitalized or seen in the emergency room, and she denied having chest pain, dizziness, palpitations, or syncope.  *Id.*  A physical examination was normal, and Dr. Gossett concluded that Karnafel's CAD was stable.  *Id.* at PageID.329-330.  Dr. Gossett directed Karnafel to continue her current medications, stop smoking, and lose weight.  *Id.* at 330.

In February and March 2017, Dr. McNamara observed that Karnafel's ejection fraction and left ventricular function were good and that she had no history of congestive heart failure.  *Id.* at PageID.370-371, 379.  In August 2017, Dr. McNamara stated that her CAD was stable.  *Id.* at PageID.361.  At that time, Karnafel denied having chest pain and reported an "adequate balance of pain relief and functionality on pain meds and remains active, recently enjoying grandchildren."  *Id.* at PageID.361-362.

Dr. Gossett evaluated Karnafel again in January and February 2018, near the time she completed the functional capacity form.  At both appointments, cardiovascular examinations were normal, though Dr. Gossett noted decreased breath sounds on auscultation and trace edema in the lower extremities.  *Id.* at PageID.321, 325.  Karnafel reported feeling well with minor complaints of chest pain and dyspnea that occurred three to four times a week with exertion.  *Id.* at PageID.319, 323, 326.  The chest pain responded to nitroglycerin and the dyspnea went away with rest—but Dr. Gossett prescribed amlodipine and ordered more testing.  *Id.*  A January 2018 coronary angiography showed no significant stenoses in the right coronary artery and mild to moderate, nonischemic disease in the first obtuse marginal branch.  *Id.* at PageID.334.  ECGs in January and August 2018 were normal.  *Id.* at PageID.339, 486.  Considering these results, Dr. Gossett concluded that Karnafel's CAD was stable and attributed the chest pains to possible vasospasm.  *Id.* at PageID.322.  She directed Karnafel to continue her current medications and to quit smoking.  *Id.*

Karnafel's cardiovascular examinations during the rest of the relevant period were normal, and Dr. McNamara noted that her blood pressure and lipids were at her goal.  *Id.* at PageID.353-354, 474-475, 478-480, 484-486,

490-492, 464. Her physicians continued to state that her CAD was stable. *Id.* at PageID.351, 472, 489.

The record also shows that Karnafel's COPD caused dyspnea and shortness of breath. But this condition appeared well controlled, given that most respiratory examinations were normal. *See, e.g.*, *id.* at PageID.353, 358, 363, 368, 459, 474, 479. In February 2019, Karnafel denied worsening dyspnea and stated she rarely uses her inhaler. *Id.* at PageID.472. Although Karnafel experienced two COPD exacerbations, they were treated by Dr. McNamara and did not lead to hospitalization or emergency room visits. Karnafel had a cold in February 2018 and an acute lower respiratory infection with diminished respiratory excursion and wheezing, rhonchi, and rales in March 2019. *Id.* at PageID.350, 466, 469-470. Both times, Karnafel was prescribed cough medication, an antibiotic, an inhaler, and steroids, which appeared to resolve the issues. *Id.* at PageID.348, 354, 470. And while Karnafel complained of worsening dyspnea in May 2019, this visit was outside the relevant period. *Id.* at PageID.461-462.

Karnafel's obstructive sleep apnea was conservatively managed with a CPAP device. *Id.* at PageID.410. Although Karnafel reported feeling fatigued, she also admitted to not always being compliant with CPAP usage

and that the mask often fell off at night. *Id.* at PageID.327, 330, 391, 489. And she did not return to the sleep clinic for assessment or for recommended adjustments. *Id.* at PageID.462, 483, 492. The ALJ was permitted to consider Karnafel's lack of compliance with CPAP usage in evaluating her claims of severe fatigue. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *aff'd*, 139 S. Ct. 1148 (2019) (ALJ reasonably interpreted lack of compliance with prescribed treatment as undermining claimant's credibility about the severity of his condition).

Thus, the evidence supports the ALJ's conclusion that Karnafel's CAD, COPD, and sleep apnea were stable and effectively managed with conservative treatment during the relevant period. As the ALJ noted, Dr. Gossett's opinion conflicted with her observations in January and February 2018 that Karnafel's CAD was stable and that her "minor complaint" of chest pain on exertion responded to medication. And Gossett cited no other medical records or observations supporting her opinion.

Letourneau challenges the ALJ's conclusion that Dr. Gossett's opinion was not stated in "vocationally relevant terms." ECF No. 14, PageID.542. But even if this argument had merit, Letourneau fails to show that the ALJ's decision was not supported by substantial evidence. Letourneau also contends that if Dr. Gossett's opinion was vague, the ALJ

14

had to seek clarification from Dr. Gossett.  *Id.* at PageID.543-544.  That argument lacks merit, as the relevant question is whether the overall record is sufficient for the ALJ to make a disability decision.  20 C.F.R. § 404.1520b.   If the record is insufficient, the ALJ has the discretion to recontact a medical source or use another method to address the insufficiency.  *Lauth v. Saul*, No. 18-13912, 2019 WL 6713599, at *3 (E.D. Mich. Oct. 31, 2019), *adopted at* 2019 WL 6701437 (E.D. Mich. Dec. 9, 2019).  Here, there was sufficient evidence permitting the ALJ to make a decision, and her decision is supported by substantial evidence.

**2.**

Several times in 2016, Dr. McNamara and P.A. Applebey directed Karnafel to keep her legs elevated.  Letourneau points to those opinions and the VE testimony that a person needing to elevate her legs for at least one third of a day would be unable to perform the jobs the ALJ found Karnafel capable of performing.  ECF No. 12, PageID.110-111.  The ALJ found McNamara's and Applebey's opinions unpersuasive because they were rendered before the relevant period and during treatment for leg ulcers and wound care—issues that were resolved before Karnafel's alleged onset date.  *Id.* at PageID.72.

15

Referring to the relevant period, the ALJ observed that Karnafel "had generally unremarkable physical examination findings."  *Id.*  Although Karnafel had edema "on occasion," the ALJ noted she generally had no swelling and that her condition was managed with compression stockings and medication.  *Id.* at PageID.69, 72.  She limited Karnafel's hours of standing and walking in the RFC to account for her edema and obesity, but found that the evidence did not warrant sedentary-level restrictions.  *Id.*

The ALJ's conclusions are supported by substantial evidence.  In May 2016, Karnafel had an ulcer on her left leg with clear drainage.  *Id.* at PageID.410.  Dr. McNamara observed chronic swelling of both feet but concluded that the ulcer was stable, recommending that Karnafel keep her legs dry and elevated "when possible."  ECF No. 12, PageID.413.  In July 2016, Karnafel saw Applebey for ulcers on both legs.  *Id.* at PageID.406-407.  She reported difficulties with the wounds weeping if she kept her legs down for any length of time.  *Id.*  Noting she had "very poor vascular circulation in the lower extremities," Applebey prescribed pain medication and referred Karnafel to wound care.  *Id.* at PageID.406-407, 409.  He also directed her to "keep her legs elevated as much as possible," and discouraged her from walking for more than five minutes per hour.  *Id.* at PageID.409.

16

Karnafel continued to suffer from worsening leg ulcers in August 2016, when she complained of pain, redness, and swelling. *Id.* at PageID.401-402.  Lisa Stier, N.P., stated that Karnafel had been treated in the hospital and was discharged with home care and antibiotics. *Id.*  Stier observed abnormalities in the knees, ankles, and feet, noted that Karnafel was limping on her left leg, and referred her back to the emergency department. *Id.* at PageID.404-405.  At a follow-up appointment, Dr. McNamara found that Karnafel's swelling was significantly reduced with Lasix, a diuretic, and observed no swelling on physical examination. *Id.* at PageID.397, 399.  She continued receiving home care for her wound. *Id.* At an appointment a week later, Dr. McNamara observed that the leg ulcers were improving and that she had no swelling of the feet. *Id.* at PageID.391, 393-394.

In September 2016, Karnafel had redness, swelling, and open ulcers on both legs despite receiving wound care. *Id.* at PageID.386.  Observing swelling in Karnafel's feet, Dr. McNamara ordered continued wound care, increased her Lasix, and recommended Unna boots and keeping her legs elevated, clean, and dry. *Id.* at PageID.388-389.  In November 2016, Dr. McNamara reported that after aggressive wound care, Karnafel's ulcers had healed, and home care was stopped. *Id.* at PageID.381.  Her feet

continued to be swollen, and Dr. McNamara stated it was "imperative that she resume compression stockings and keep leg[s] elevated when possible."  *Id.* at PageID.383-384.

In February 2017, Dr. McNamara found that Karnafel's leg ulcers had healed well and observed no swelling in her feet.  *Id.* at PageID.376, 378. After running out of Lasix in March 2017, Karnafel went to the emergency room for leg edema.  *Id.* at PageID.371.  At a follow-up appointment, Dr. McNamara observed swelling in Karnafel's feet but noted that despite "some chronic venous insufficiency and history of venous statis ulcers in her legs in the past," she was doing well.  *Id.* at PageID.371, 373.  He attributed to her recent edema to the missed doses of Lasix and weight gain caused by Actos, a diabetes medication.  *Id.* at PageID.371.  After stopping Actos and resuming Lasix, Karnafel's edema and weight decreased.  *Id.*

From May through November 2017, physical examinations showed no swelling or leg ulcers.  *Id.* at PageID.358-359, 363-364, 368.  In January and February 2018, Dr. Gossett observed trace edema in Karnafel's lower extremities, but in later February Dr. McNamara observed no swelling.  *Id.* at PageID.321, 325, 353.  A May 2018 physical examination showed no swelling.  *Id.* at PageID.491.  In August 2018, Karnafel complained of "lots

18

of ankle swelling," but McNamara observed no swelling on examination and made no specific recommendations.  *Id.* at PageID.482, 485-486.  Karnafel again reported leg swelling in November 2018 despite increasing her Lasix. *Id.* at PageID.476-477.  On examination, Dr. McNamara observed swelling but no ulcers; he prescribed Zaroxolyn, a diuretic, and instructed Karnafel to resume using compression stockings when she was able.  *Id.* at PageID.477, 479-480.  In February 2019, Karnafel reported that using Zaroxolyn helped manage her venous insufficiency and edema.  *Id.* at PageID.472.  Dr. McNamara observed no swelling at that time and prescribed more Zaroxolyn and recommended compression stockings.  *Id.* at PageID.474-475.

This record supports the ALJ's finding that Dr. McNamara's and P.A. Applebey's opinions about leg elevation were rendered when Karnafel was treated for leg ulcers—a condition that was resolved by February 2017. Karnafel did not experience any ulcers after the alleged onset date in April 2017, and no treating source recommended keeping her legs elevated after the ulcers healed.  And although she experienced some intermittent leg swelling during the relevant period, it was conservatively managed with medication and compression stockings.

The ALJ also considered the limiting effects of Karnafel's diabetes, a comorbidity for edema and leg ulcers.  *See id.* at PageID.397.  The ALJ acknowledged that Karnafel's diabetes was poorly controlled but found that she had a sedentary lifestyle and was not compliant with a diabetic diet.  *Id.* at PageID.70.  She also observed that treatment with a short course of steroids raised Karnafel's blood sugar.  *Id.*  Finally, the ALJ found no evidence of hospitalization for ketoacidosis or significant complications like neuropathy, nephropathy, or retinopathy.  *Id.*

This reasoning is also supported by substantial evidence.  It is well documented that Karnafel had insulin-resistant diabetes, with poor glycemic control and significantly elevated A1C levels.  *Id.* at PageID.354, 359, 365-366, 369-371, 379, 384, 394, 397, 410, 413, 462, 475, 477-480, 486, 492.  Her diabetes was managed with medication.  *See id.*  While Dr. McNamara stated that Karnafel had poor diabetic control on multiple medications due to insulin resistance, he also suspected poor dietary compliance and a sedentary lifestyle.  *Id.* at PageID.351, 462.  And Karnafel admitted being "less compliant with [her] diabetic diet," although she felt well and had better glycemic control and lower A1C values when she complied.  *See id.* at PageID.351, 355, 359, 364, 369.

20

In evaluating the limiting effects of diabetes, ALJs assess the condition's impact on other body systems—such as retinopathy, nephropathy, slow-healing infections, and neuropathy.  *See* Social Security Ruling (SSR) 14-2p.  Karnafel's venous insufficiency and slow-healing leg ulcers are discussed above.  She also had renal insufficiency with an eGFR of 48, but there is no indication she was on dialysis or required a kidney transplant.  *Id.* at PageID.464, 486.  Karnafel's healthcare providers noted that she had no retinopathy, and there is no evidence that she experienced neuropathy.  *Id.* at PageID.391, 462, 520.  And beyond edema and leg ulcers, Letourneau has not shown that Karnafel's diabetes caused any other functional limitation.  *See Samul v. Comm'r of Soc. Sec.*, No. 20-10597, 2021 WL 2305634, at *5 (E.D. Mich. Mar. 1, 2021) ("Without more, Samul's 'systemic issues' (i.e., hypertension and diabetes) are mere diagnoses, which say nothing about their severity or functional impact.").

### 3.

In April 2018, state agency physician Dr. Sachdev reviewed the available medical records.  ECF No. 12, PageID.150-152.  Finding there was no new material evidence since Karnafel's last disability application, he adopted the RFC from the previous ALJ's decision.  *Id.* at PageID.150.  He found that Karnafel was capable of light work, including lifting or carrying 20

21

pounds occasionally and ten pounds frequently, as well as standing, walking, and sitting for six hours during an eight-hour workday. *Id.* But she could only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crouch; and never crawl. *Id.* She was to avoid concentrated exposure to heat, cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. *Id.* at PageID.151.

The ALJ found this opinion somewhat persuasive. *Id.* at PageID.72. She found that the limitation to light work aligned with the record but stated that Karnafel's ongoing edema and other impairments since the earlier decision supported more postural restrictions. *Id.* Thus, she also limited the RFC to standing or walking for four hours, occasional balancing, and no crouching. *Id.* at PageID.68.

Because the ALJ did not fully credit any of the medical opinions, Letourneau contends that the RFC is improperly based on the ALJ's lay opinion and independent medical findings. ECF No. 14, PageID.545, 547-548. The argument that an RFC is invalid without the support of a medical opinion lacks merit. An ALJ's RFC finding can be supported by substantial evidence even without a fully consistent physician opinion. *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018). Indeed,

"[n]o bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019).  The ALJ made that connection here.

The ALJ's decision highlighted that, during the relevant period, Karnafel's conditions were relatively stable and were being conservatively treated with medication.  *Id.* at PgeID.69-71.  Yet she also found that recent medical records not reviewed by Dr. Sachdev showed ongoing edema, dyspnea, and fatigue—conditions that support a diminished ability to stand or walk for long periods.  *Id.* at PageID.72.  Courts in this circuit have routinely found RFC assessments that are more restrictive than the opinion evidence to be supported by substantial evidence.  *See e.g.*, *Drinkwine v. Comm'r of Soc. Sec.*, No. 18-12327, 2019 WL 4866144, at *3 (E.D. Mich. Aug. 8, 2019), *adopted*, 2019 WL 4626674 (E.D. Mich. Sept. 24, 2019); *Chess v. Berryhill*, No. 2:17-CV-00163, 2019 WL 845986, at *7 (E.D. Tenn. Jan. 3, 2019).

## C.

Letourneau argues that the ALJ failed to adequately consider Karnafel's subjective complaints.  ECF No. 14, PageID.545-546.  The

regulations set forth a two-step process for evaluating a plaintiff's subjective symptoms.  First, the ALJ evaluates whether objective medical evidence of an underlying condition exists and whether that condition could reasonably be expected to produce the alleged symptoms.  20 C.F.R. § 404.1529(a); SSR 16-3p.  If so, the ALJ assesses any work-related limitations by determining the intensity, persistence, and limiting effects of these symptoms.  20 C.F.R. § 404.1529 (a); SSR 16-3p.  In sum, ALJs assess whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record."  SSR 16-3p.  To evaluate the limiting effects of subjective symptoms, ALJs consider all available evidence, including the plaintiff's history, laboratory findings, statements by the plaintiff, and medical opinions.  20 C.F.R. § 404.1529(a).

Letourneau disputes the ALJ's determination that Karnafel's daily activities were not as limited as her alleged symptoms suggested.  ECF No. 12, PageID.71.  The ALJ stated that Karnafel reported performing various activities, including caring for her personal needs—though using a chair to shower—preparing simple meals, washing dishes for 20-minute increments, doing laundry, and shopping for groceries twice a month.  *Id.* (citing PageID.101-103, 274-276).  She could drive a car short distances

three times a week, manage her personal finances, and attended a 50+ club.  *Id.* (citing PageID.88, 276-277).

Letourneau maintains that this description did not accurately convey Karnafel's limitations.  Karnafel testified that after standing for 20 minutes, she had to sit and elevate her legs because her ankles would "balloon out." *Id.* at PageID.92-93, 101.  While she shopped for groceries twice a month, she had to pace herself.  *Id.* at PageID.276.  And she reported having chest pain with "most anything" she did and "constantly" falling asleep.  *Id.* at PageID.273-274.  But the ALJ considered these allegations and found them inconsistent with the medical evidence.  *Id.* at PageID.68-69.  As discussed above, the medical evidence substantially supports the ALJ's RFC findings, given that Karnafel's conditions were relatively stable and managed with medication and other conservative treatment during the relevant period.  And Karnafel's symptoms reported to her healthcare providers were not as severe as those described to the ALJ.  *See, e.g.*, *id.* at PageID.323 ("The patient feels well with minor complaints," though she gets chest tightness with activities such as cleaning or walking); PageID.361 (reporting that her medications give her an "adequate balance of pain relief and functionality" allowing her to remain active).

Finally, Letourneau argues that Karnafel's self-described limitations should have been given more weight because her strong work history bolsters her credibility.  ECF No. 14, PageID.549-550.  Though 20 C.F.R. § 404.1529(c)(3) advises consideration of a claimant's prior work record in evaluating his or her symptoms, there is no strict requirement that an ALJ affirmatively discuss the claimant's work history in the subjective symptom evaluation or in any other part of the decision.  *Dutkeiwicz v. Comm'r of Soc. Sec.*, 663 F. App'x 430, 433 (6th Cir. 2016).[5]  When, as here, the ALJ's subjective symptom evaluation is well-supported by the medical record, there is no reason to disturb the ALJ's determination.

## IV.   Conclusion

The Court **RECOMMENDS** that Letourneau's motion for summary judgment (ECF No. 14) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 17) be **GRANTED**, and the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

---

[5] While *Dutkeiwicz* was decided before the Commissioner rescinded SSR 96-7p, courts in this district continue to hold that "a claimant is not entitled to 'substantial credibility' solely because of the claimant's 'exemplary work' history."  *Maslar v. Comm'r of Soc. Sec.*, No. 20-11880, 2022 WL 456536, at *3 (E.D. Mich. Jan. 19, 2022), *adopted at* 2022 WL 451667 (E.D. Mich. Feb. 14, 2022); *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 761 (E.D. Mich. 2020).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: May 24, 2022

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in**

27

**length and complexity to the objections**, but there is otherwise no page

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 24, 2022.

s/Marlena Williams_____
MARLENA WILLIAMS
Case Manager
